## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRETT ALTERS, APRIL ROCKSTEAD BARKER, DAVE BATTINIERI, CHLOE CRATER, DAVID DEKING, DELORIS A. JONES, MALIA MOORE, DELOLA NELSON-REYNOLDS, GEORGE O'CONNOR, CHRISTINE PALMER, et al., individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN AG, TAKATA CORPORATION, and TK HOLDINGS INC. | |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ........................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 9

THE PARTIES .................................................................................................... 10

    I.      Volkswagen Defendants ................................................................... 10

    II.     Takata Defendants ............................................................................ 11

    III.    Plaintiffs ............................................................................................ 12

GENERAL FACTUAL ALLEGATIONS .......................................................... 16

    I.      Takata is a Major Manufacturer of Airbags and Inflators. ................ 17

    II.     Takata's Airbags Have A Common, Uniform Defect ........................ 18

          A.     Takata Recklessly Chose An Inexpensive and Dangerous Propellant ................................................................................ 18

          B.     Takata's Knowledge of the Inflator Defect ............................. 21

    III.    Takata Airbag Failures and Defendants' Inadequate Response ........................ 24

          A.     2003-2008: Early Incidents and the 2008 Honda Recall (08V-593) ....... 24

          B.     2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA ........ 27

          C.     2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations ........................................................................... 31

          D.     2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V- 260) ................................................................... 32

          E.     2013-2014:  Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132) ........................................ 34

          F.     2014-2015: Forced National Recall And Takata's Admission of a Defect ................................................................................ 39

    IV.    The VW Defendants Sold Their Vehicles As "Safe" and "Reliable" ................. 44

    V.     Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers ...... 45

          A.     Slow and Inadequate Recalls ................................................. 45

          B.     Failure to Provide Replacement Vehicles ............................... 47

          C.     Defective Replacement Airbags .............................................. 47

TOLLING OF THE STATUTE OF LIMITATIONS .......................................... 48

CHOICE OF LAW ALLEGATIONS ................................................................. 49

    I.      Takata ............................................................................................... 49

    II.     VW .................................................................................................... 49

CLASS ACTION ALLEGATIONS ................................................................... 50

# TABLE OF CONTENTS
## (continued)

**Page**

REALLEGATION AND INCORPORATION BY REFERENCE ........................................... 55

CLAIMS FOR RELIEF ................................................................................................. 56

I.    Nationwide Claims ................................................................................. 56

    A.    Common Law and State Claims Against the VW Defendants ............... 56

        COUNT 1 Fraudulent Concealment ...................................................... 56

        COUNT 2 Unjust Enrichment ............................................................... 58

        COUNT 3 Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* .................................................................... 59

        COUNT 4 Breach of Implied Warranty of Merchantability, N.J. Stat. Ann. § 12a:2-314 ............................................................................ 63

    B.    Common Law and State Law Claims against the Takata Defendants ......................................................................................... 64

        COUNT 5 Fraudulent Concealment ...................................................... 64

        COUNT 6 Breach of Implied Warranty ................................................. 66

        COUNT 7 Unjust Enrichment ............................................................... 67

        COUNT 8 Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903, *et seq.* ............................................... 68

        COUNT 9 Negligence ........................................................................... 72

II.    State Sub-Class Claims ........................................................................... 74

    A.    Claims Brought on Behalf of the Arkansas Sub-Class ........................... 74

        COUNT 10 Violations of the Deceptive Trade Practice Act Ark. Code Ann. § 4-88-101, et seq. ...................................................... 74

        COUNT 11 Breach of Implied Warranty of Merchantability Ariz. Rev. Stat. §§ 44-1521, et seq. .......................................................... 78

    B.    Claims Brought on Behalf of the Arizona Sub-Class ............................. 79

        COUNT 12 Violation of the Consumer Fraud Act Ariz. Rev. Stat. §§ 44-1521, et seq. ......................................................................... 79

        COUNT 13 Breach of the Implied Warranty of Merchantability Ariz. Rev. Stat. §§ 47-2314 and 47-2A212 ........................................... 83

    C.    Claims Brought on Behalf of the Connecticut Sub-Class ...................... 84

        COUNT 14 Violation of the Connecticut Unlawful Trade Practices Act Conn. Gen. Stat. §§ 42-110A, et. seq. ....................................... 84

        COUNT 15 Breach of the Implied Warranty of Merchantability Conn. Gen. Stat. §§ 42-110A, et. seq. ...................................................... 87

    D.    Claims Brought on Behalf of the Florida Sub-Class .............................. 88

1355576.2

# TABLE OF CONTENTS
## (continued)

Page

COUNT 16 Violation of the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201, *et seq.* ................................................. 88

COUNT 17 Breach of Implied Warranty of Merchantability Fla. Stat. § 672.314, et seq. ...................................................................... 92

E.    Claims Brought on Behalf of the Illinois Sub-Class................................ 93

COUNT 18 Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/1, et seq. ......................... 93

COUNT 19 Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/1, et seq..................................................... 97

COUNT 20 Breach of the Implied Warranty of Merchantability 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212 ........................................ 98

F.    Claims Brought on Behalf of the Nevada Sub-Class............................... 99

COUNT 21 Violation of the Nevada Deceptive Trade Practices Act Nev. Rev. Stat. § 598.0903 et seq..................................................... 99

COUNT 22 Breach of Implied Warranty of Merchantability N.R.S. §§ 104.2314 and 104A.2212............................................... 103

G.    Claims Brought on Behalf of the New York Sub-Class ....................... 104

COUNT 23 Violation of the New York General Business Law N.Y. Gen. Bus. Law § 349 ........................................................................ 104

COUNT 24 Violation of the New York General Business Law N.Y. Gen. Bus. Law § 350 ........................................................................ 108

COUNT 25 Breach of Implied Warranty of Merchantability N.Y. U.C.C. Law §§ 2-314 and 2A-212 ............................................... 110

H.    Claims Brought on Behalf of the Pennsylvania Sub-Class.................... 111

COUNT 26 Violation of the Unfair Trade Practices and Consumer Protection Law Pa. Stat. Ann. §§ 201-1, et seq. ..................... 111

COUNT 27 Breach of the Implied Warranty of Merchantability 13 Pa. Stat. Ann. §2314 ............................................................... 115

I.    Claims Brought on Behalf of the Tennessee Sub-Class ....................... 116

COUNT 28 Violation of the Tennessee Consumer Protection Act Tenn. Code Ann. §§ 47-18-101, et seq. ......................................... 116

COUNT 29 Breach of Implied Warranty Tenn. Code §§ 47-2-314 and 47-2A-212 ................................................................................. 120

J.    Claims Brought on Behalf of Wisconsin Sub-Class ............................ 121

COUNT 30 Violation of the Wisconsin Deceptive Trade Practices Act Wis. Stat. § 110.18................................................................ 121

COUNT 31 Breach of Implied Warranty Wis. Stat. § 402.314............. 125

- iii -

**TABLE OF CONTENTS**
**(continued)**

                                                                                              **Page**

PRAYER FOR RELIEF ........................................................................................................ 126

DEMAND FOR JURY TRIAL ............................................................................................. 127

1355576.2

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products— which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended. Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Defendant Takata Corporation and its related entities ("Takata"),[1] and equipped in vehicles manufactured by the Defendants collectively known as "Volkswagen," "VW," or the "VW Defendants": Volkswagen Aktiengesellschaft ("VW AG") and Volkswagen Group of America, Inc. ("VW America").

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the

_____

[1] On June 25, 2017, Takata Corporation's United States subsidiary, Defendant TK Holdings, Inc., filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. *In Re TK Holdings, Inc.*, No. 17-11375 (Bankr. D. Del.). Likewise, Takata Corporation has filed for insolvency protection in Japan and has indicated that it will file a petition under 11 U.S.C. § 1501 to recognize the Japanese insolvency proceeding in the United States. ECF No. 1857, *In re Takata Prod. Liab. Litig.*, MDL No. 2599 (S.D. Fla.).

airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

5.      The following basic illustration depicts Takata's airbag module:



6.      In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction. Indeed, ammonium nitrate is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City.

7.      Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing

irregular and dangerous behavior ranging from inertness to violent combustion.  When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.      As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants.  As of July 2017, Takata airbags have been responsible for at least 12 deaths and 180 serious injuries in the United States alone.

9.      When the VW Defendants purchased Takata's airbags for their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

10.     The volatility and instability of Takata's ammonium-nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

11.     Takata and its automaker purchasers first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland.  BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the incident as an anomaly, without alerting federal safety regulators.

12.     Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata investigated the incident and inaccurately minimized it as "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

13.     The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions.  It

- 3 -

took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

14.     Behind the scenes, however, Takata and Honda were busy conducting tests that revealed far more serious problems.  As reported in *The New York Times*, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect.  After a 2007 airbag rupture, Honda began collecting inflators for further testing as well.

15.     Tragically, these airbag failures were the first of many to come. Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls.  Despite the repeated Takata/Honda recalls, and though the VW Defendants knew their vehicles were also equipped with Takata airbags containing ammonium nitrate, they failed to take reasonable measures to investigate or protect the public.

16.     Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators, the press, and private plaintiffs.  By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action.  Whereas approximately 3 million vehicles had been recalled up until that point (the vast majority of which were Hondas), the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers.  Just one year later, in June 2014, another 5.6 million vehicles were recalled, and by October 2014, global recalls had reached 16.5 million vehicles.  As of July 2017, global recalls exceed 60 million vehicles.

17.     Even then, Defendants worked hard to limit the scope of the recall to humid parts of the country.  They strenuously and falsely claimed that the risks caused by the Inflator Defect

- 4 -

disappeared to the north of some arbitrary latitude in the American South.  And they mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

18.     By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures.*

19.     With additional pressure and public scrutiny, the automakers eventually agreed to NHTSA's demand.  At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

20.     In response to the additional pressure and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags.  This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to rupture.

21.     In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."  And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.  Still, even Takata's defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate.  And shockingly, certain automakers continue to equip new vehicles with

- 5 -

inflators containing ammonium nitrate, even after conceding that inflators containing ammonium nitrate create an unacceptable public safety hazard.

22.    Further, in its DIRs, Takata acknowledged that the defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

23.    As a result of Takata's admission that its inflators are defective, tens of millions additional vehicles have been or will be recalled in the United States, pushing the total number of recalled vehicles nationwide over 44 million.  While Takata has records of which manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in.  The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

24.    As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively.  Defendants have acknowledged that the process could take at several *years* because of supply constraints.  Even before the number of recalled vehicles nationwide doubled from approximately 17 million to 34 million, Honda's spokesman acknowledged that "[t]here's simply not enough parts to repair every recalled single car immediately."

25.    Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced.  Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced.  And following Takata's submission of the May 18th DIRs, NHTSA's recall website received over one million visits.

26.    Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars.  Some of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiffs and Class members.

1355576.2

As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

27.     Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant within the inflator, a fact that Takata's representative admitted at a Congressional hearing in June 2015.  At the Congressional hearing, the Takata representative repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

28.     Takata and the VW Defendants knew or should have known that the Takata airbags installed in millions of vehicles were defective.  Both Takata and the VW Defendants, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety.  Moreover, the VW Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

29.     The actions of Defendants Takata and Honda have been especially disturbing. Despite the shocking record of injuries and failures in Honda vehicles, Takata and Honda were slow to report the full extent of the danger to drivers and passengers, and they failed to issue appropriate recalls.  Honda and Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem.  Although Takata and Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 15 years.

30.     Even before purchasing inflators from Takata, the VW Defendants were aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus the VW Defendants were on notice of the Inflator Defect even before they installed the inflators in their vehicles, because Takata reviewed the designs of the inflators with the Vehicle Manufacturers and the Vehicle Manufacturers approved the designs.  The VW Defendants were also put on notice of the Inflator Defect no later than 2008, when Honda first notified regulators of a problem with its Takata airbags.  Because their vehicles also contained Takata airbags, the VW Defendants knew or should have known at that time that there was a safety problem with their airbags, and the VW Defendants should have launched their own investigations and notified their customers.  That responsibility only grew as incidents multiplied.

31.     Instead, Defendants put profits ahead of safety.  Takata cut corners to build cheaper airbags, and the VW Defendants sold Class members vehicles that they knew or should have known contained those defective airbags.  For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only relatively recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

32.     As a result of Defendants' misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages.  The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.

33.     Further, Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.  Plaintiffs and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their

unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

34.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

35.     Also, as a direct result of Defendants' misconduct, each plaintiff and member of the class has out-of-pocket economic damage by virtue of their having incurred the expense of taking the time to bring their car in for repair.

36.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

37.     In addition, as a result of Defendants' misconduct, the class of Automotive Recyclers, as defined below, has suffered economic damage.  Automotive Recyclers have purchased recalled vehicles and the defective Takata airbags contained in the vehicles, but are now unable to sell the airbags, which are essentially valueless.  Had Automotive Recyclers known the truth about the problems associated with the Inflator Defect, they would not have purchased the recalled vehicles and airbags contained therein or would have paid a reduced amount.  Moreover, Automotive Recyclers have suffered economic injury as they have stored and maintained and continue to store and maintain the defective Takata airbags.

## JURISDICTION AND VENUE

38.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

1355576.2

39.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

40.     This Court has personal jurisdiction over Defendants pursuant to Va. Code Ann. § 8.01-328.1 because their principal place of business is in this District; they conduct substantial business in this District; and, on information and belief, some of the actions giving rise to the Complaint took place in this District.

41.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district.

## THE PARTIES

### I.     Volkswagen Defendants

42.     Volkswagen AG ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany.  VW AG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. VW AG is the parent corporation of VW America and Audi AG.  According to VW AG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands, VW AG boasts a 12.9% share of the worldwide passenger car market.  VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

43.     Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  VW America is a wholly-owned subsidiary of Volkswagen AG, and it

engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.  In 2014 alone, VW America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states.

44.    VW AG engineered, designed, developed, manufactured, and installed the Class Vehicles (defined below), and approved the Defective Airbags for use on those vehicles. VW AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Class Vehicles.

45.    VW AG and VW America are collectively referred to as the "VW Defendants" or "Volkswagen."

## II.    **Takata Defendants**

46.    Defendant Takata Corporation ("Takata") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Takata is a specialized supplier of automotive safety systems that designs, manufactures, tests, markets, distributes, and sells airbags.  Takata is a vertically-integrated company and manufactures component parts in its own facilities. Takata, either directly or through its wholly-owned subsidiaries, manufactures airbags for distribution in the United States, including the airbags at issue in this litigation. Takata delivers its products, including the airbags at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers in the United States.

47.    Defendant TK Holdings Inc. ("TK Holdings") is a subsidiary of Takata Corporation and is headquartered in Auburn Hills, Michigan. TK Holdings sells, designs, manufactures, tests, markets, and distributes airbags in the United States. TK Holdings both directly and through subsidiaries, owns and operates 56 manufacturing plants in twenty countries. TK Holdings manufactures airbags in the United States, including airbags at issue in this litigation. TK Holdings delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States.

48.     Defendants Takata and TK Holdings are collectively referred to as "Takata" or the "Takata Defendants." Takata is the manufacturer of all the defective airbags that are the subject of this Complaint.

III.    **Plaintiffs**

49.     Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use. All Plaintiffs identified below and the proposed Classes were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

50.     Further, all Plaintiffs identified below and the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. All Plaintiffs identified below and the Classes, either through a higher purchase price or higher lease payments, paid more than they would have had the Inflator Defect been disclosed. All Plaintiffs identified below and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

51.     All Plaintiffs identified below and the proposed Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

52.    All Plaintiffs identified below and members of the proposed Classes who have brought their vehicles to dealerships have suffered out-of-pocket economic damage by virtue of their having incurred the expense of taking the time to bring their car in for repair.

53.    The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to all identified Plaintiffs below and the proposed Classes.

54.    Plaintiff Brett Alters resides in Las Vegas, Nevada. Plaintiff owns a 2012 VW Golf TDI, which was purchased used in August 2015 for $15,693.77 from Findlay Volkswagen in St. George, Utah. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of his vehicle and Volkswagen vehicles generally. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

55.    Plaintiff April Rockstead Barker resides in Waukesha, Wisconsin. Plaintiff owns a 2012 VW Passat, which was purchased used in or about 2014 for approximately $12,000 from Hall Volkswagen in Brookfield, Wisconsin. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

56.    Plaintiff Dave Battinieri resides in West Chester, Pennsylvania. Plaintiff owns a 2014 VW Passat Wolfsburg, which was purchased new in August, 2014 for $20,967 from YBH Volkswagen in New Town, Pennsylvania. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have

purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

57.    Plaintiff Chloe Crater resides in Little Rock, Arkansas. Plaintiff owns a 2012 VW Passat, which was purchased used on November 24, 2014 for $21,844 from Owens-Murphy Volkswagen in Little Rock, Arkansas. Prior to purchasing the vehicle, Plaintiff reviewed Volkswagen's website for information and specification on the vehicle, including its safety features. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

58.    Plaintiff David DeKing resides in Gilbert, Arizona. Plaintiff owns a 2012 VW CC, which was purchased new in May, 2011 for $33,014 from San Tan Volkswagen in Gilbert, Arizona. Prior to purchasing the vehicle, Plaintiff viewed promotional materials and television commercials that touted the vehicle's safety and dependability. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

59.    Plaintiff Deloris A. Jones resides in Poughkeepsie, New York. Plaintiff owns a 2006 Volkswagen Passat, which Plaintiff purchased used for $15,397 in Poughkeepsie. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

60.    Plaintiff Malia Moore resides in Old Hickory, Tennessee. Plaintiff owns a 2010 VW Passat, which was purchased used in March 2012 for $18,525 from Whitewater Motor Company in Milan, Indiana. Prior to purchasing the vehicle, Plaintiff reviewing information online about the vehicle, including its safety features. The value of Plaintiff's vehicle has been

- 14 -

diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

61.     Plaintiff Delola Nelson-Reynolds resides in Evanston, Illinois. Plaintiff owns a 2010 VW CC, which was purchased used in February 2015 for $23,760 from Golf Mill Ford in Niles, Illinois. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials that touted the safety and dependability of Volkswagen vehicles, reviewed the vehicle's history, and spoke to the dealer's salesman about the vehicle. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

62.     Plaintiff George O'Connor resides in Wesley Chapel, Florida. Plaintiff owns a 2012 VW EOS, which was new in April 2011 for $37,955.48 from Kuhn Honda in Tampa, Florida. Prior to purchasing the vehicle, Plaintiff conductive extensive research online, in magazines, and through showroom visits to learn about the vehicle, including its safety features, and received numerous representations through these sources regarding the value, safety, and dependability of his vehicle. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

63.     Plaintiff Christine Palmer resides in Danbury, Connecticut. Plaintiff owns a 2013 VW Passat, which was purchased new in November 2013 for $26,000 from New Milford VW in New Milford, Connecticut. Prior to purchasing the vehicle, Plaintiff had viewed or heard commercials that touted the safety and dependability of Volkswagen vehicles. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. Plaintiff would not have purchased the vehicle or would not have paid as much for it had Plaintiff known of the problems or risk associated with the vehicle's Inflator Defect.

- 15 -

## GENERAL FACTUAL ALLEGATIONS

64.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture or use of Defective Airbags in the Class Vehicles, including but not limited to diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

65.    "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that are subject to the recalls identified in the tables below; all Takata airbags installed in VW vehicles subject to recalls relating to Takata's May 18, 2015 DIRs, the Coordinated Remedy Order issued by NHTSA in In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in In re EA 15-001 Air Bag Inflator Rupture, and any amendments thereto; and all Takata airbags installed in VW vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy, rupture, or fail to deploy. All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

66.    "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags.

67.    The following tables identifies the Volkswagen vehicles recalled to date, and which of the front airbags were included in the recall for each vehicle (driver or passenger):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Volkswagen | 16V-078 | Volkswagen | Jetta SportWagen and Golf | 2010-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Eos | 2012-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Passat | 2012-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | CC | 2009-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Passat Sedan and Wagon | 2007-2010 | Driver (SDI) |
| Volkswagen | 16V-079 | Volkswagen | Passat Sedan and Wagon | 2006 | Driver (PSDI-5) |

68.     In addition, as outlined in NHTSA's Third Amendment to the Coordinated Remedy Order, In re: Docket No. NHTSA 2015-0055, the following Volkswagen vehicles will be recalled in the future:

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Volkswagen | Amended Annex A | Volkswagen | CC | 2015-2017 | Driver (SDI) |
| Volkswagen | Amended Annex A | Volkswagen | GTI | 2009-2013 | Driver |

## I.    **Takata is a Major Manufacturer of Airbags and Inflators.**

69.     Defendant Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s. Airbags made up 38.2 percent of its business as of 2015.

70.     Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983. By 2014, Takata had captured 22 percent of the global automotive airbag market.

71.     Takata Corporation has claimed to prioritize driver safety as its "dream," "dedication," and "commitment."

72.     Takata claims to be "motivated by the preciousness of life" and pledges to "communicate openly and effectively." Takata has failed to live up to these assurances by:

        a.      manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;

b.      intentionally concealing the foregoing from Plaintiffs, Class members, and federal regulators; and

c.      making incomplete representations about the safety and reliability of its airbags, while purposefully withholding material facts from Plaintiffs, Class members, and federal regulators that contradicted these representations.

## II.    Takata's Airbags Have A Common, Uniform Defect

### A.      Takata Recklessly Chose An Inexpensive and Dangerous Propellant

73.      The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

74.      The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



75.    When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

76.    In the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives. Ammonium nitrate is a dangerous material that should not be used in airbags. It is an inherently volatile and unstable chemical.

77.    Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively

1355576.2

inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

78.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks. Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

79.    Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

80.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

81.    Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant. Indeed, Takata's representative confirmed at a recent Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

82.    The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap."

Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

83.    Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

84.    For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

85.    Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

B.    **Takata's Knowledge of the Inflator Defect**

86.    Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

87.    At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to

the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

88.     Mr. Shimizu grossly understated the problem. Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

89.     On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems. Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

90.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

91.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

92.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

93.     Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

94.     Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors.

95.     Moreover, while Defendants, and particularly Takata, had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several automakers, including VW, have been or will be required to recall model year 2013, 2014, 2015, and 2016 vehicles because of the risk of the Takata airbags rupturing. And Takata has now admitted that replacement airbags installed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

III.    **Takata Airbag Failures and Defendants' Inadequate Response**

A.    **2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)**

96.    Honda was among the first automakers to use Takata's new air bags. Honda and Takata began discussing inflators with ammonium-nitrate propellant as early as 1998, and Honda first installed such inflators in its 2001 Model Year vehicles. Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

97.    On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident. As summarized in a later section of this Complaint, her car was not recalled until May 2015, more than a decade later.

98.    Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW. That investigation took place at a Takata facility in Michigan, and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective. Takata confirmed this in a defect information report to NHTSA more than a decade later.

99.    In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver. Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata. Takata reported back to Honda that it was unable to find a cause for the incident. Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge. Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

100.    Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant. As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled

- 24 -

with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit. In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

101.    Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards. The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

102.    Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture. The result was so startling that engineers began designing possible fixes in anticipation of a recall.

103.    But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed. One former Takata employee stated that "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.' It was not standard procedure."

104.    Takata did not disclose these tests to the public or federal regulators. In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, Plaintiffs allege, upon information and belief, that Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

105.    In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags. As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators. Rather, it

callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

106.    After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrap yards for the same purpose.

107.    Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion. Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

108.    The victims of the four Honda incidents – one in 2004 and three in 2007 – brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed. In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

    a.    On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.

    b.    On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

109.    Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

110.    As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags

that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

111.    Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**B.    2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

112.    Additional incidents took place after the 2008 Recall that underscored its inadequacy:

a.    On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she was bleeding from a severe gash in her neck. Ms. Griffin's car was not part of the 2008 Recall. Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

b.    On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the collision itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death.  Ms. Parham's car was not part of the 2008 Recall.

      c.      Another Takata airbag-related fatal incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

      d.      According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

113.    With incidents mounting, Takata and Honda revisited the issue yet again. In June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington. At the time, Takata engineers claimed that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable. The Takata engineers further claimed that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

114.    After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to. At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

115.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

116.    As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall"). Thus, it was two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

117.    In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

118.    NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

119.    NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

120.    In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

121.    Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

122.    Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

123.    Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial

Response"), and then a full response on February 19, 2010 ("Full Response").  Both responses provided vague and misleading information about the seriousness of the problem.

124.    Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

125.    Takata also claimed that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, it gave just the manufacturing dates.

126.    In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

127.    Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

128.    In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda."  This statement would prove to be false.

129.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

130.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

131.    The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

### C.    2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations

132.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

133.    In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

134.    Honda's explanation for the airbag defect changed yet again, but still misleadingly focused on the manufacturing process. Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

- 31 -

135.    Once again, however, injuries continued to mount:

a.    In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only because she applied pressure with her fingers to stem the arterial bleeding.

b.    On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

### D.    2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V- 260)

136.    In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

137.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators." On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

138.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

139.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640

- 32 -

airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

140. In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

141. Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act. In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014. Eight of these incidents involved Takata airbags. In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

142. Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate. In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

143. Dangerous and tragic incidents continued to mount during this period.

a.      On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

b.      On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him.  Honda reached a confidential settlement with the driver in 2013.

c.      On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d.      On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.      On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.      On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a confidential settlement.

g.      On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

E.      **2013-2014:  Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)**

144.   By 2013, it became clear to federal regulators, and Defendants were already aware, that the Defective Airbag issue and the number of Defective Airbags were much more significant than Takata or Honda initially reported to NHTSA.

145.   On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags. By March 6, 2013, Honda claimed that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the

manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

146. In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality. Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

147. On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

> Defect description:
>
> In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

148. On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

> Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

149. It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however,

- 35 -

how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

150.    In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

151.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.    On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.    On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag. Ms. Erdman filed suit and reached a confidential settlement.

c.    Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face. In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building. As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object. And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.    On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel. According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

- 36 -

152.    By 2014, the incident rate picked up even more dramatically, with over a dozen incidents involving injuries or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California.  For example:

a.    On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b.    On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram 1500 ruptured and ejected metal fragments following an accident.  The driver suffered severe physical injury as a result.

c.    On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d.    On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e.    In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

153.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents included both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

154.    On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers

that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

155.    Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain  which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers.

156.    On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

157.    On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

158.    By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million. Defendants, however, had still not recalled all of the vehicles containing Defective Airbags.

159.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

160.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles – its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

161.    The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

a.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

b.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

c.    On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

d.    On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

e.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

f.    On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

g.    On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

**F.    2014-2015: Forced National Recall And Takata's Admission of a Defect**

162.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated

October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

163.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

164.    The U.S. Department of Justice also began investigating whether Takata committed any crimes. On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

165.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

166.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall. Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which

are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

167.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

168.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags. Days later, Mazda expanded the geographic scope of its recall. By December 23, BMW had also agreed to a nationwide recall.

169.    Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved." A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken a decade ago. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

170.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

171.    In response to public scrutiny and pressure from NHTSA and private plaintiffs, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

1355576.2

172.    In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

173.    Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's airbags containing ammonium nitrate. And shockingly, certain automakers continue to equip new vehicles with airbags containing ammonium nitrate, even after admitting that airbags containing ammonium nitrate as the primary propellant are prone to rupture, and thus create an unacceptable public safety hazard.

174.    Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

175.    As a result of Takata's admission that its inflators are defective, an additional 17 million vehicles must be recalled in the United States, pushing the total number of recalled vehicles nationwide will exceed 40 million. While Takata has records tracking which manufacturers it sold Defective Airbags to, it claims not to have records indicating which vehicles those Defective Airbags were installed in. The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs, and its corresponding admission that its airbags are defective.

176.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed in section V, *infra*.

a.      On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

b.      On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

c.      On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

d.      On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

e.      On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old Kylan Langlinais's carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries two days later.

177.    In June 2015, Volkswagen reported that a Takata-made side curtain airbag inflator in a 2015 Volkswagen Tiguan crossover ruptured after the driver hit a deer. News reports at the time noted that the incident stood out from previously reported Takata ruptures because of how recently the vehicle was made.

178.    No later than October 2015, Volkswagen was gathering and testing Takata inflators.

179.    By February 2016, Takata and Volkswagen had issued recalls of approximately 850,000 VW and Audi vehicles.

180.    As of June 2016, Volkswagen said it was continuing to use front-airbag inflators without the moisture-absorbing desiccant on certain 2016 and 2017 model year cars, including the Volkswagen CC, Audi TT, and Audi R8.

181.    Over the past 15 years that Takata has known there was a problem with the safety of its airbags, there have been at least 12 deaths and 180 injuries linked to defective Takata

airbags nationwide. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota. Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

182.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, an event that may be tied to the unstable and volatile ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both). For example:

a.    Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.    Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

## IV.    The VW Defendants Sold Their Vehicles As "Safe" and "Reliable"

183.    At all relevant times, in advertisements and promotional materials, the VW Defendants continuously maintained that their vehicles were safe and reliable. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class Vehicles' safety in

- 44 -

Defendants' advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

184.    Examples of the VW Defendants' safety and reliability representations include the following:

a.    Brochures that regularly touted its vehicles' standard and optional airbags.

b.    A 2012 Passat brochure that promised "passive safety features to help protect you and keep you safe," and that Volkswagen will "place safety at the top of our list."

c.    A 2010 Jetta brochure that touted its "IIHS top safety pick" designation and its use of "the latest in safety technology," as well as its multiple airbags.

d.    A 2010 VW CC brochure that touts the brand's industry-leading number of "IIHS top safety pick" designations and "six standard airbags."

## V.    **Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers**

### A.    **Slow and Inadequate Recalls**

185.    Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million will be recalled in the United States due to the Inflator Defect.

186.    At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and expected to increase production to 1 million replacement inflators per month by September 2015—well short of the number required to supply the ten automakers that have issued recalls.

187.    At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

188.    Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

189.    Honda stated that it would not send recall letters to car owners or lessees until there are parts available, meaning that many drivers would not receive notices for weeks or

longer, as they continue to drive vehicles with potentially deadly airbags. Honda owners who have received recall notices have been told to wait at least a month before their authorized dealer has availability to assess their vehicle.

190.    Toyota dealers have reported that wait times for customers who own affected vehicles to get their Takata airbags replaced could be as long as one to three months.

191.    In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made. In the alternative, some automakers are advising customers to refrain from driving their vehicles until the airbags can be replaced.

192.    Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

193.    Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperable unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."

194.    As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but also a more frightening concern: "no one knows if the replacement inflators currently being installed will suffer the same issue." Indeed, in response to repeated questioning at a Congressional hearing in June 2015, Takata's representative refused to assure the public that replacement inflators containing ammonium nitrate would be safe and not prone to rupture.

1355576.2

## B. **Failure to Provide Replacement Vehicles**

195.    The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until VW Defendants complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

196.    As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

197.    VW Defendants are not providing loaner or replacement vehicles on a comprehensive basis.

## C. **Defective Replacement Airbags**

198.    Perhaps most alarming, the replacement components manufactured by Takata that many manufacturers are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its recently submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

199.    Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed by manufacturers through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture- induced instability, such as rust stains, the tendency to clump together, and size variations. As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

1355576.2

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

200.    Upon information and belief, Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. VW Defendants were also made aware of the Inflator Defect in Takata's airbags due to field incidents, complaints to NHTSA, and recalls involving Takata airbags. Defendants have concealed from or failed to notify Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect.

201.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

202.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

203.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### Discovery Rule

1355576.2

204.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

205.    Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiffs and Class members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

## CHOICE OF LAW ALLEGATIONS

### I.    Takata

206.    Takata's United States headquarters is in Auburn Hills, Michigan. The Michigan headquarters is responsible for sales, administration and testing.

207.    Takata does substantial business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

208.    On information and belief, Michigan hosts a significant number of Takata's U.S. operations.

209.    In addition, the conduct that forms the basis for each and every Class members' claims against Takata emanated from Takata's headquarters in Auburn Hills, Michigan.

210.    Takata personnel responsible for customer communications are located at Takata's Michigan headquarters, and the core decision not to disclose the Inflator Defect to consumers was made and implemented from there.

211.    The engineering teams responsible for developing, designing, and testing the ammonium nitrate propellant, and investigating airbag ruptures, were located in Michigan.

212.    Takata's presence is more substantial in Michigan than any other state.

### II.    VW

213.    The VW Defendants' United States operations are incorporated in New Jersey, and the VW Defendants do substantial business in New Jersey, with a significant portion of the proposed Nationwide Class located in New Jersey.

- 49 -

1355576.2

214.    The VW Defendants' presence is more substantial in New Jersey than any other state.

## CLASS ACTION ALLEGATIONS

215.    The Classes' claims all derive directly from a single course of conduct by Takata and the VW Defendants. This case is about the responsibility of Takata and the VW Defendants, at law and in equity, for their knowledge, their conduct, and their products. Takata and the VW Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

### The Nationwide Consumer Class

216.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Consumer Class defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was recalled, entered into a lease or bought a Class Vehicle, and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

### The State Consumer Sub-Classes

1355576.2

217.    Plaintiffs allege statewide class action claims on behalf of classes in the following states: Arkansas, Arizona, Connecticut, Florida, Illinois, Nevada, New York, Pennsylvania, Tennessee, and Wisconsin. Each of these State Consumer Sub-Classes is initially defined as follows:

> All persons who, prior to the date on which the Class Vehicle was recalled, entered into a lease or bought a Class Vehicle in the state of ____ (e.g., Florida), and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

**Numerosity and Ascertainability**

218.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

219.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Takata and the VW Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

220.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the Inflator Defect;

b.    Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

1355576.2

c.      Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

d.      Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

e.      Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

f.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

h.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.      Whether Defendants misrepresented that the Class Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

k.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

l.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

n.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s.      Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

u.      How such penalties should be most equitably distributed among Class members;

v.      Whether certain Defendants conspired together to violate RICO; and

w.      Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**Typicality**

221.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Takata and the VW Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

**Adequate Representation**

- 53 -

222.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

223.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Superiority**

224.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants Takata and the VW Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

225.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Takata and the VW Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

226.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

227.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

228.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

229.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

230.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, Choice of Law Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

1355576.2

**CLAIMS FOR RELIEF**

I.      **Nationwide Claims**

        A.      **Common Law and State Claims Against the VW Defendants**

**COUNT 1**
**Fraudulent Concealment**

231.    Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against Volkswagen under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under New Jersey law, because New Jersey has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

232.    Volkswagen concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

233.    Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

234.    Volkswagen had a duty to disclose the Inflator Defect because it:

1355576.2

a.     Had exclusive and/or far superior knowledge and access to the facts, and Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.     Intentionally concealed the foregoing from Plaintiffs; and

c.     Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

235.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Plaintiffs and Class Members trusted Volkswagen not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

236.    Volkswagen concealed and suppressed these material facts to falsely assure purchasers and consumers that its vehicles were capable of performing safely, as represented by Volkswagen and reasonably expected by consumers.

237.    Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost Volkswagen money.  It did so at the expense of Plaintiffs and the Class.

238.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

239.    Had they been aware of the Defective Airbags installed in the Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's fraudulent concealment.

240. Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Volkswagen's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Volkswagen's conduct.

241. On information and belief, Volkswagen still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Class Vehicles.

242. The value of all Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of the Defective Airbags, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

243. Accordingly, Volkswagen is liable to the Class for their damages in an amount to be proven at trial.

244. Volkswagen's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Volkswagen. Volkswagen's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT 2**
**Unjust Enrichment**

245. Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against Volkswagen under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under New Jersey law, because New Jersey has the most significant relationship to the issues and facts

- 58 -

relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

246.    Volkswagen has received and retained a benefit from the Plaintiffs and inequity has resulted.

247.    Volkswagen benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

248.    It is inequitable for Volkswagen to retain these benefits.

249.    Consumer Plaintiffs do not have an adequate remedy at law.

250.    As a result of Volkswagen's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**COUNT 3**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***

251.    Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against Volkswagen.

252.    Plaintiffs, the Sub-Class, and Defendants are or were "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

253.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

254.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any

person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Defendants engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

255.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective  Airbags installed in them.

256.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

257.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants

- 60 -

1355576.2

from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

258.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

259.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

260.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the National Consumer Class.

261.    Defendants knew or should have known that their conduct violated the New Jersey CFA.

262.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

263.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

264.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

       a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

       b.    Intentionally concealed the foregoing from Plaintiffs; and/or

       c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

265.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

266.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the National Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

267.    Plaintiffs and the Nationwide Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

268.    Defendants' violations present a continuing risk to Plaintiffs, the Nationwide Consumer Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1355576.2

269.    As a direct and proximate result of Defendants' violations of the New Jersey CFA, Plaintiffs and the Nationwide Consumer Class have suffered injury-in-fact and/or actual damage.

270.    Plaintiffs and the Class are entitled to recover legal and/or equitable relief including an order enjoining Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

**COUNT 4**
**Breach of Implied Warranty of Merchantability,**
**N.J. Stat. Ann. § 12a:2-314**

271.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against Volkswagen.

272.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags.

273.    When Plaintiffs and the Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition.

274.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

275.    On information and belief, Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and

communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

276.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Nationwide Consumer Class have been damaged in an amount to be proven at trial.

**B.    Common Law and State Law Claims against the Takata Defendants**

**COUNT 5**
**Fraudulent Concealment**

277.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against Takata under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

278.    Takata concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

279.    Takata took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

280.    On information and belief, Takata still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

281.    Takata had a duty to disclose the Inflator Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts than Plaintiffs and Class Members, and Takata knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs; and

c.    Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

282.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

283.    Takata concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by Takata and reasonably expected by consumers.

284.    Takata actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost Takata money.  Takata concealed these facts at the expense of Plaintiffs and the Class.

285.    Plaintiffs and the Class were unaware of these omitted material facts, and would not have acted as they did if they had known of the concealed and/or suppressed facts.

286.    Had they been aware of the Defective Airbags and Takata's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Takata's fraudulent concealment.

287.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Takata's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Takata's conduct.

288.    The value of all Class members' vehicles has diminished as a result of Takata's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

289.    Accordingly, Takata is liable to the Class for their damages in an amount to be proven at trial.

290.    Takata's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Takata. Takata's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 6
## Breach of Implied Warranty

291.    Consumer Plaintiffs bring this Claim on behalf of the Nationwide Consumer Class against Takata under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

292.    Takata is a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

293.    Under Mich. Comp. Laws § 440.2314, a warranty that the Defective Airbags, and by extension, the Class Vehicles, were in merchantable condition was implied by law in the transactions when Plaintiffs and Class Members purchased their Class Vehicles.

294.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect, leading to an unreasonable likelihood of serious bodily injury and death.

295.    Takata was provided notice of the airbag problems through numerous complaints filed against it, internal investigations, and by many individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Takata and the other Defendants issued the recalls and the allegations of the Inflator Defect became public. Moreover, Takata and the other defendants were aware of these problems long before Plaintiffs and the Class and had ample notice and opportunity to correct them.

296.    As a direct and proximate result of Takata's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

**COUNT 7**
**Unjust Enrichment**

297.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

298.    Takata has received and retained a benefit from the Plaintiffs and inequity has resulted.

299.    Takata benefitted through its unjust conduct, by selling Defective Airbags with a concealed safety-and-reliability related defect, at a profit, for more than these Defective Airbags were worth, to Plaintiffs, who overpaid for these Defective Airbags by overpaying for their Class

Vehicles, and/or would not have purchased these Defective Airbags and Class Vehicles at all; and who have been forced to pay other costs.

300.    It is inequitable for Takata to retain these benefits.

301.    Consumer Plaintiffs do not have an adequate remedy at law.

302.    As a result of Takata's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**COUNT 8**
**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws §§ 445.903, *et seq.***

303.    Consumer Plaintiffs bring this Claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

304.    Consumer Plaintiffs are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

305.    At all relevant times hereto, the Takata Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

306.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1). The Takata Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive

- 68 -

manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them, the Takata Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

307.    In the course of their business, the Takata Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. The Takata Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

308.    The Takata Defendants have known of the Inflator Defect in the Defective Airbags since at least the late 1990s.

309.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by permitting the Class Vehicles to be marketed as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Takata Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA. The Takata Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

310.    In the course of the Takata Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. The Takata Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were

safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

311.    The Takata Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

312.    The Takata Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Consumer Plaintiffs.

313.    The Takata Defendants knew or should have known that their conduct violated the Michigan CPA.

314.    As alleged above, the Takata Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

315.    To protect their profits and to avoid remediation costs and a public relations nightmare, the Takata Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

316.    The Takata Defendants owed Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in  them because the Takata Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

317.    Because the Takata Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

318.    The Takata Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Consumer Plaintiffs. A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

319.    Consumer Plaintiffs suffered ascertainable loss caused by the Takata Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Takata Defendants' complete disregard for safety, Consumer Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Consumer Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

320.    The Takata Defendants' violations present a continuing risk to Consumer Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

321.    As a direct and proximate result of the Takata Defendants' violations of the Michigan CPA, Consumer Plaintiffs have suffered injury-in-fact and/or actual damage.

322.    Consumer Plaintiffs seek injunctive relief to enjoin the Takata Defendants from continuing its unfair and deceptive acts; monetary relief against the Takata Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory

- 71 -

damages in the amount of $250 for Plaintiffs Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Mich. Comp. Laws § 445.911.

323.    Consumer Plaintiffs also seek punitive damages against the Takata Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others. The Takata Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or Defective Airbags installed in them, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them. The Takata Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 9
### Negligence

324.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

325.    The Takata Defendants owed a duty of care to the Consumer Plaintiffs, who were foreseeable end users, to design and manufacture their airbags so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs.

326.    The Takata Defendants breached their duty of care by, among other things:

a.    Negligently and recklessly failing to take all necessary steps to ensure that its products-which literally can make the difference between life and death in an accident-function as designed, specified, promised, and intended;

b.    Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

- 72 -

c.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

d.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

327.    Takata's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs, as well as ongoing foreseeable damages that Consumer Plaintiffs continue to suffer to this day.

328.    As a direct, actual, and proximate result of Takata's misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages, which are continuing in nature, including:

a.      the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.      the continued exposure of Consumer Plaintiffs to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

329.    Defendant Takata's negligence is ongoing and continuing, because Takata continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

330.    In addition to damages, Consumer Plaintiffs seek injunctive relief to enjoin the Takata Defendants from continuing its negligence by using the same dangerous chemical in the replacement airbags that the Takata Defendants are manufacturing to this date.

1355576.2

II.     **State Sub-Class Claims**

    A.     **Claims Brought on Behalf of the Arkansas Sub-Class**

**COUNT 10**
**Violations of the Deceptive Trade Practice Act**
**Ark. Code Ann. § 4-88-101, et seq.**

331.     This claim is brought only on behalf of the Arkansas Consumer Sub-Class against Takata and Volkswagen.

332.     Defendants, Plaintiffs, and the Arkansas Consumer Sub-Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

333.     The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

334.     The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  Ark. Code Ann. § 4-88-108.

335.     In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

336.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

- 74 -

337.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

338.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Arkansas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

339.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

340.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

341.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Arkansas Consumer Sub-Class.

342.    Defendants knew or should have known that their conduct violated the Arkansas DTPA.

343.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

344.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

345.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

346.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

347.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Arkansas Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

348.    Plaintiffs and the Arkansas Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

349.    Defendants' violations present a continuing risk to Plaintiffs, the Arkansas Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

350.    As a direct and proximate result of Defendants' violations of the Arkansas DTPA,

351.    Plaintiffs and the Arkansas Sub-Class have suffered injury-in-fact and/or actual damage.

352.    Plaintiffs and the Arkansas Sub-Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs and the Arkansas Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

353.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT 11
### Breach of Implied Warranty of Merchantability
### Ariz. Rev. Stat. §§ 44-1521, et seq.

354.    This claim is brought only on behalf of the Arkansas Consumer Sub-Class against Takata and Volkswagen.

355.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

356.    With respect to leases, the VW Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

357.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

358.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

359.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

360.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1355576.2

361.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Arkansas Sub-Class have been damaged in an amount to be proven at trial.

**B.    Claims Brought on Behalf of the Arizona Sub-Class**

**COUNT 12**
**Violation of the Consumer Fraud Act**
**Ariz. Rev. Stat. §§ 44-1521, et seq.**

362.    This claim is brought only on behalf of the Arizona Consumer Sub-Class against Takata and Volkswagen.

363.    Plaintiffs, the Arizona Sub-Class, and Defendants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

364.    The Class Vehicles and/or the Defective Airbags installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

365.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

366.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

367.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

368.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

369.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Arizona CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

370.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

371.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

372.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Arizona Sub-Class.

373.    Defendants knew or should have known that their conduct violated the Arizona CFA.

374.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

375.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

376.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

377.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

378.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Arizona Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

379.    Plaintiffs and the Arizona Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

380.    Defendants' violations present a continuing risk to Plaintiffs, the Arizona Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

381.    As a direct and proximate result of Defendants' violations of the Arizona CFA,

382.    Plaintiffs and the Arizona Sub-Class have suffered injury-in-fact and/or actual damage.

383.    Plaintiffs and the Arizona Sub-Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs and the Arizona Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

384.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT 13
### Breach of the Implied Warranty of Merchantability
### Ariz. Rev. Stat. §§ 47-2314 and 47-2A212

385.    This claim is brought only on behalf of the Arizona Consumer Sub-Class against Takata and Volkswagen.

386.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c); and "sellers" of motor vehicles and/or airbags under Ariz. Rev. Stat. § 47-2103(A)(4).

387.    With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

388.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

389.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

390.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

391.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

392.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Arizona Sub-Class have been damaged in an amount to be proven at trial.

     **C.**    **Claims Brought on Behalf of the Connecticut Sub-Class**

**COUNT 14**
**Violation of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. §§ 42-110A, et. seq.**

393.     This claim is brought on behalf of the Connecticut Consumer Sub-Class.

394.     The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

395.     Plaintiffs, the Connecticut Sub-Class, and Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3). Defendants are in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

396.     Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

397.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

398.     Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants

- 84 -

approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them.

399.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Connecticut UTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

400.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

401.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

402.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or Defective Airbags installed in them with an intent to mislead Plaintiffs and the Connecticut Sub-Class.

403.    Defendants knew or should have known that their conduct violated the Connecticut UTPA.

404.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

405.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

406.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.    Intentionally concealed the foregoing from Plaintiffs; and/or

        c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

407.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

408.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Connecticut Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an

- 86 -

otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

409.    Plaintiffs and the Connecticut Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

410.    Defendants' violations present a continuing risk to Plaintiffs, the Connecticut Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

411.    As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiffs and the Connecticut Sub-Class have suffered injury-in-fact and/or actual damages.

412.    Plaintiffs and the Connecticut Sub-Class are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

413.    Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

**COUNT 15**
**Breach of the Implied Warranty of Merchantability**
**Conn. Gen. Stat. §§ 42-110A, et. seq.**

414.    This claim is brought on behalf of the Connecticut Consumer Sub-Class.

415.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags under Conn. Gen. Stat. Ann. § 42a-2-104(1).

416.    A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

417.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

418.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

419.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Connecticut Sub-Class have been damaged in an amount to be proven at trial.

D.    **Claims Brought on Behalf of the Florida Sub-Class**

**COUNT 16**
**Violation of the Florida Deceptive and**
**Unfair Trade Practices Act Fla. Stat. §§ 501.201, *et seq.***

420.    This claim is brought only on behalf of the Florida Consumer Sub-Class against Volkswagen and Takata.

421.    Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

422.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

423.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …"

1355576.2

Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

424.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

425.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

426.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

427.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

- 89 -

1355576.2

428. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

429. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

430. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Florida Sub-Class.

431. Defendants knew or should have known that their conduct violated the FDUTPA.

432. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

433. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

434. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

435.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

436.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Florida Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

437.    Plaintiffs and the Florida Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

438.    Plaintiffs and the Florida Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

439.    As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Sub-Class have suffered injury-in-fact and/or actual damage.

440.    Plaintiffs and the Florida Sub-Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

441.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**COUNT 17**
**Breach of Implied Warranty of Merchantability**
**Fla. Stat. § 672.314, et seq.**

442.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the Florida Consumer Sub-Class against Volkswagen and Takata.

443.    Defendants are and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Fla. Stat. § 672.104(1).

444.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Fla. Stat. § 672.314.

445.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were `not merchantable or fit for the ordinary purpose for which cars are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

446.    Plaintiffs and the Florida Consumer Sub-Class, at all relevant times, were intended third-party beneficiaries of: (a) Takata's sale of the Defective Airbags to the VW Defendants, and (b) the VW Defendants' sale of vehicles containing the Defective Airbags to Plaintiffs and the Florida Consumer Sub-Class.

- 92 -

447.    Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

448.    As a direct and proximate result of Defendants' breach of the warranties of merchantability and fitness for a particular purpose, Plaintiffs and the Florida Sub-Class have been damaged in an amount to be proven at trial.

      **E.**      **Claims Brought on Behalf of the Illinois Sub-Class**

**COUNT 18**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, et seq.**

449.    This claim is brought on behalf of the Illinois Consumer Sub-Class against Volkswagen and Takata.

450.    Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

451.    Plaintiff and the Illinois Sub-Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

452.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

453.    Defendants participated in misleading, false, or deceptive acts that violated the Illinois CFA. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Illinois CFA.

454.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

- 93 -

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

455.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

456.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

457.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Illinois CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

458.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

459.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

460.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Illinois Sub-Class.

461.    Defendants knew or should have known that their conduct violated the Illinois CFA.

462.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

463.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

464.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.    Intentionally concealed the foregoing from Plaintiffs; and/or

        c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

465.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

466.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Illinois Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

467.    Plaintiffs and the Illinois Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

468.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

469.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Illinois Sub-Class have suffered injury-in-fact and/or actual damage.

470.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Sub-Class seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

471.    Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 et seq.

- 96 -

## COUNT 19
### Violation of the Illinois Uniform Deceptive Trade Practices Act
### 815 ILCS 510/1, et seq.

472.    This claim is brought on behalf of the Illinois Consumer Sub-Class against Volkswagen and Takata.

473.    Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 ILCS 510/2, prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …; (7) represent[ing] that goods or services are of a particular standard, quality, or grade … if they are of another; … (9) advertis[ing] goods or services with intent not to sell them as advertised; … [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

474.    Defendants are "persons" as defined in 815 ILCS 510/1(5).

475.    In the course of Defendants' business, Defendants failed to disclose and actively concealed the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them as described above. Accordingly, Defendants engaged in deceptive trade practices as defined in 815 ILCS 510/2, including representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and otherwise engaging in conduct likely to deceive.

476.    Defendants intended for Plaintiff and the Illinois Sub-Class to rely on their aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

477.    Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

- 97 -

478.    Defendants' conduct proximately caused injuries to Plaintiff and the Illinois Sub-Class.

479.    Plaintiff and the Illinois Sub-Class were injured as a result of Defendants' conduct in that Plaintiff and the Illinois Sub-Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

480.    Plaintiffs seek an order enjoining Defendants' deceptive practices, attorneys' fees, and any other just and proper relief available under the Illinois UDTPA per 815 ILCS 510/3.

**COUNT 20**
**Breach of the Implied Warranty of Merchantability**
**810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**

481.    This claim is brought on behalf of the Illinois Consumer Sub-Class against Volkswagen and Takata.

482.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles and/or airbags under § 5/2-103(1)(d).

483.    With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

484.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

485.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

486.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a

threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

487.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

488.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Illinois Sub-Class have been damaged in an amount to be proven at trial.

F.    **Claims Brought on Behalf of the Nevada Sub-Class**

**COUNT 21**
**Violation of the Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. § 598.0903 et seq.**

489.    This claim is brought only on behalf of the Nevada Consumer Sub-Class against Volkswagen and Takata.

490.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, et seq. prohibits deceptive trade practices.  Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with

intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

491.    Defendants engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Class Vehicles and/or the Defective Airbags installed in them have uses and benefits which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

492.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

493.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

494.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

- 100 -

1355576.2

495.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Nevada DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

496.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

497.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

498.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Nevada Sub-Class.

499.    Defendants knew or should have known that their conduct violated the Nevada DTPA.

500.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1355576.2

501.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

502.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

503.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

504.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Nevada Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

505.    Plaintiffs and the Nevada Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have

- 102 -

paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

506. Defendants' violations present a continuing risk to Plaintiffs, to the Nevada Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

507. As a direct and proximate result of Defendants' violations of the Nevada DTPA, Plaintiffs and the Nevada Sub-Class have suffered injury-in-fact and/or actual damage.

508. Accordingly, Plaintiffs and the Nevada Sub-Class seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act. Nev. Rev. Stat. § 41.600.

**COUNT 22**
**Breach of Implied Warranty of Merchantability**
**N.R.S. §§ 104.2314 and 104A.2212**

509. This claim is brought only on behalf of the Nevada Consumer Sub-Class against Volkswagen and Takata.

510. Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under N.R.S. § 104.2104(1) and "sellers" of motor vehicles and/or airbags under § 104.2103(1)(c).

511. With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under N.R.S. § 104A.2103(1)(p).

512. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.R.S. §§ 104.2105(1) and 104A.2103(1)(h).

513. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.R.S. §§ 104.2314 and 104A.2212.

514.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

515.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

516.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Nevada Sub-Class have been damaged in an amount to be proven at trial.

### G.    Claims Brought on Behalf of the New York Sub-Class

**COUNT 23**
**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349**

517.    This claim is brought only on behalf of the New York Consumer Sub-Class against Volkswagen and Takata.

518.    Plaintiffs and New York Sub-Class are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

519.    Defendants are "persons," "firms," "corporations," or "associations" within the meaning of N.Y. Gen. Bus. Law § 349.

520.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.  Defendants' conduct directed

toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

521.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

522.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

523.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

524.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s.  Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

525.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New York GBL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and

shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

526.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

527.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

528.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New York Sub-Class.

529.    Defendants knew or should have known that their conduct violated the New York GBL.

530.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

531.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1355576.2

532.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

533.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

534.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New York Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

535.    Plaintiffs and the New York Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

536.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1355576.2

537.    As a direct and proximate result of Defendants' violations of the New York GBL, Plaintiffs and the New York Sub-Class have suffered injury-in-fact and/or actual damage.

538.    New York Sub-Class members seek punitive damages against Defendants because Defendants' conduct was egregious.  Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived Plaintiffs and the New York Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them.  Defendants' egregious conduct warrants punitive damages.

539.    Because Defendants' willful and knowing conduct caused injury to the New York Sub-Class, the New York Sub-Class seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT 24**
**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 350**

540.    This claim is brought only on behalf of the New York Consumer Sub-Class against Volkswagen and Takata.

541.    Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

542.    N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

543.     Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and the New York Sub-Class.

544.     Defendants have violated § 350 because the misrepresentations and omissions regarding the Inflator Defect, and Defendants' failure to disclose and active concealing of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, as set forth above, were material and likely to deceive a reasonable consumer.

545.     New York Sub-Class members have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing or leasing Class Vehicles with the Defective Airbags installed in them, New York Plaintiffs and the New York Sub-Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them. Defendants' representations were false and/or misleading because the concealed the Inflator Defect and safety issues seriously undermine the value of the Class Vehicles.  Had Plaintiffs and the New York Sub-Class known this, they would not have purchased or leased their vehicles and/or paid as much for them.

546.     Pursuant to N.Y. Gen. Bus. Law § 350 e, the New York Sub-Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Sub-Class member. Because Defendants' conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

547.     The New York Sub-Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law § 350.

## COUNT 25
## Breach of Implied Warranty of Merchantability
## N.Y. U.C.C. Law §§ 2-314 and 2A-212

548.    This claim is brought only on behalf of the New York Consumer Sub-Class against Volkswagen and Takata.

549.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles and/or airbags under § 2-103(1)(d).

550.    With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

551.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

552.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

553.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

554.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

555.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the New York Sub-Class have been damaged in an amount to be proven at trial.

**H.    Claims Brought on Behalf of the Pennsylvania Sub-Class**

**COUNT 26**
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**Pa. Stat. Ann. §§ 201-1, et seq.**

556.    This claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Volkswagen and Takata.

557.    Plaintiffs purchased or leased their Class Vehicles with Defective Airbags installed in them primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

558.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

559.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

560.    Defendants engaged in unlawful trade practices, including representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

- 111 -

561.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

562.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

563.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

564.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

565.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

1355576.2

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

566.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

567.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Pennsylvania Sub-Class.

568.    Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

569.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

570.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

571.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

       a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

       b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

572.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

573.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Pennsylvania Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

574.    Plaintiffs and the Pennsylvania Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

575.    Defendants' violations present a continuing risk to Plaintiffs, the Pennsylvania Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

576.    As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Sub-Class have suffered injury-in-fact and/or actual damage.

577.    Defendants are liable to Plaintiffs and the Pennsylvania Sub-Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).

- 114 -

Plaintiffs and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT 27**
**Breach of the Implied Warranty of Merchantability**
**13 Pa. Stat. Ann. §2314**

578.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Volkswagen and Takata.

579.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of 13 Pa. Stat. Ann. § 2104.

580.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to 13 Pa. Stat. Ann. § 2314.

581.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

582.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

583.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

I.    **Claims Brought on Behalf of the Tennessee Sub-Class**

**COUNT 28**
**Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-101, et seq.**

584.    This claim is brought only on behalf of the Tennessee Consumer Sub-Class against Volkswagen and Takata.

585.    Plaintiffs and the Tennessee Sub-Class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

586.    Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

587.    Defendants' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

588.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell or lease them as advertised.

589.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

590.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

591.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Tennessee CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

592.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

593.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

594.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Tennessee Sub-Class.

595.    Defendants knew or should have known that their conduct violated the Tennessee CPA.

596.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

597.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

598.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.      Intentionally concealed the foregoing from Plaintiffs; and/or

        c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1355576.2

599.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

600.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Tennessee Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

601.    Plaintiffs and the Tennessee Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

602.    Defendants' violations present a continuing risk to Plaintiffs, the Tennessee Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

603.    As a direct and proximate result of Defendants' violations of the Tennessee CPA, Plaintiffs and the Tennessee Sub-Class have suffered injury-in-fact and/or actual damage.

604.    Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Tennessee Sub-Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT 29
### Breach of Implied Warranty
### Tenn. Code §§ 47-2-314 and 47-2A-212

605.    This claim is brought only on behalf of the Tennessee Consumer Sub-Class against Takata and Volkswagen.

606.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles and/or airbags under § 47-2-103(1)(d).

607.    With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

608.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

609.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

610.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

611.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1355576.2

612.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Tennessee Sub-Class have been damaged in an amount to be proven at trial.

**J.    Claims Brought on Behalf of Wisconsin Sub-Class**

**COUNT 30**
**Violation of the Wisconsin Deceptive Trade Practices Act**
**Wis. Stat. § 110.18**

613.    This claim is brought only on behalf of the Wisconsin Consumer Sub-Class against Volkswagen and Takata.

614.    Defendants are "person[s], firm[s], corporation[s], or association[s]" within the meaning of the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

615.    Plaintiffs are members of "the public" within the meaning of Wis. Stat. § 110.18(1).  Plaintiffs purchased or leased one or more Class Vehicles.

616.    The Wisconsin DTPA prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. § 100.18(1).

617.    Defendants participated in misleading, false, or deceptive acts that violated the Wisconsin DTPA, by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  Defendants also engaged in unlawful trade practices by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard and quality when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct likely to deceive. All of these defective processes would be material to a reasonable consumer.

618.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

- 121 -

619.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

620.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Prior to installing the Defective Airbags in their vehicles, the VW Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and the VW Defendants approved Takata's designs. And the VW Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

621.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Wisconsin DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

622.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

623.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

624.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Wisconsin Sub-Class.

625.    Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

626.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

627.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

628.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.    Intentionally concealed the foregoing from Plaintiffs; and/or

- 123 -

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

629.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

630.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Wisconsin Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

631.    Plaintiffs and the Wisconsin Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

632.    Defendants' violations present a continuing risk to Plaintiffs, the Wisconsin Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

633.    As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, Plaintiffs and the Wisconsin Sub-Class have suffered injury-in-fact and/or actual damage.

634.    Pursuant to Wisconsin DTPA, Plaintiffs and the Wisconsin Sub-Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at

trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Wisconsin DTPA.

## COUNT 31
## Breach of Implied Warranty
## Wis. Stat. § 402.314

635.    This claim is brought only on behalf of the Wisconsin Consumer Sub-Class against Volkswagen and Takata.

636.    Defendants are and were at all relevant times "merchants" with respect to motor vehicles and/or airbags under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles and/or airbags under § 402.103(1)(d).

637.    With respect to leases, the VW Defendants are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

638.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

639.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

640.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

641.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers

- 125 -

before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

642.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Tennessee Sub-Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.    An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B.    A declaration that the airbags in Class Vehicles are defective;

C.    A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

E.    An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

F.    An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

1355576.2

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.      A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

I.      An award of attorneys' fees and costs, as allowed by law;

J.      An award of prejudgment and post judgment interest, as provided by law;

K.      Leave to amend this Complaint to conform to the evidence produced at trial; and

L.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

_____August 8, 2017

**CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO,PC**

*James E. Cecchi*
_____
JAMES E. CECCHI
jcecchi@carellabyrne.com
CAROLINE BARTLETT
cbartlett@carellabyrne.com
DONALD A. ECKLUND
decklund@carellabyrne.com
5 Becker Farm Road
Roseland, NJ   07068-1739
T: 973 994-1700
F: 973 994-1744

**LIEFF CABRASER HEIMANN AND BERNSTEIN LLP**
DAVID STELLINGS

dstellings@lchb.com
250 Hudson Street, 8th Floor
NY, NY 10012
T:  212-355-9500
F:  212-355-9592

**LIEFF CABRASER HEIMANN AND
BERNSTEIN LLP**
ELIZABETH CABRASER
ecabraser@lchb.com
NIMISH DESAI
ndesai@lchb.com
275 Battery St., Suite 3000
San Francisco, CA 94111-3339
T:  415-956-1000
F:  415-956-1008

*Counsel for Plaintiffs and the Proposed Class*

1355576.2